No. 15-4322

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

MICHAEL T. RAND,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of North Carolina, No. 3:10-cr-182
Before the Honorable Robert J. Conrad, Jr.

## BRIEF FOR DEFENDANT-APPELLANT
## MICHAEL T. RAND

STEPHEN D. COUNCILL
ROGERS & HARDIN LLP
229 Peachtree Street NE
2700 International Tower
Atlanta, GA  30303
(404) 522-4700

CLAIRE J. RAUSCHER
WOMBLE CARLYLE SANDRIDGE
   AND RICE LLP
One Wells Fargo Center
301 South College Street, Suite 3500
Charlotte, NC  28202
(704) 331-4961

SETH P. WAXMAN
BRENT J. GURNEY
JEANNIE S. RHEE
KELLY P. DUNBAR
MATTHEW GUARNIERI
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

July 24, 2015

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................iv

INTRODUCTION .................................................................................1

JURISDICTION....................................................................................3

STATEMENT OF ISSUES ...................................................................3

STATEMENT OF THE CASE...............................................................4

    A.    The Prosecution's Allegations ....................................4

    B.    Rand's First Trial...........................................................7

    C.    Rand's Renewed Efforts To Obtain Exculpatory
          Evidence .........................................................................11

          1.    Accounting records .................................................11

          2.    False email deletions..............................................12

    D.    Rand's Second Trial ....................................................14

          1.    The prosecution's case-in-chief .............................14

               *i.*    *Obstruction of justice*......................................14

               *ii.*    *Reserve adjustments* ......................................15

               *iii.*    *The GMAC sale-leaseback transaction* ..........15

          2.    The Defense Case....................................................16

               *i.*    *Obstruction of justice*......................................16

                *ii.*    *Reserve adjustments* ......................................17

                *iii.*    *The GMAC sale-leaseback transaction* ..........21

          3.    The prosecution's rebuttal.......................................22

4.  Closing arguments....................................................24

E.  Sentencing .............................................................24

SUMMARY OF ARGUMENT ..........................................................25

ARGUMENT ...........................................................................27

I.  Exclusion Of The False Email Accusations Violated Rand's Constitutional Right To Present A Defense ..................................27

A.  The Excluded Evidence Was Necessary For Rand To Have A Meaningful Opportunity To Defend Himself .......................28

1.  Rand was prevented from coherently explaining the circumstances surrounding his alleged confession....................................................................28

2.  Rand was prevented from proving that his statements at the June 26 interview were not misleading ..............................................................31

3.  Rand was prevented from effectively cross-examining former Beazer employees .......................................34

B.  There Was No Ground To Exclude The Evidence .............................35

C.  The Erroneous Exclusion Was Not Harmless ....................................37

II.  Overlapping Discovery And Evidentiary Rulings Erroneously Deprived Rand Of The Ability To Defend Against The Prosecution's Accounting Case ........................................................38

A.  The District Court Wrongly Denied Rand Access To Relevant Accounting Evidence From Beazer ....................................39

1.  *Nixon* does not apply to third-party Rule 17(c) subpoenas ..............................................................40

2.  Rand's request satisfied the correct Rule 17(c) standard ..............................................................43

B.    The District Court Wrongly Excluded Exculpatory Evidence ......................................................45

C.    The Court Improperly Permitted The Prosecution To Use Lay Opinion Testimony As A Substitute For Expert Testimony .........................................................48

D.    These Errors Prejudicially Affected All Counts ..................51

III.   The Prosecution Committed Reversible Misconduct In Its Closing Argument.........................................................52

A.    The Prosecution Improperly Appealed To Class Prejudice ....................................................................52

B.    The Prosecution Improperly Commented On Rand's Silence ......................................................................54

C.    The Prosecution Wrongly Vouched For A Key Witness....................55

IV.    The Court Miscalculated Rand's Guidelines Sentence ..................57

CONCLUSION .......................................................................61

REQUEST FOR ORAL ARGUMENT ................................................62

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Arizona v. Fulminante*, 499 U.S. 279 (1991)............................................37

*Bowman Dairy Co. v. United States*, 341 U.S. 214 (1951) ......................41

*Buckner v. Polk*, 453 F.3d 195 (4th Cir. 2006)........................................48

*Chambers v. Mississippi*, 410 U.S. 284 (1973) .......................................34

*City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548
    (11th Cir. 1998) .............................................................................49

*Crane v. Kentucky*, 476 U.S. 683 (1986)........................................2, 3, 25, 29, 30, 36

*Davis v. Alaska*, 415 U.S. 308 (1974)......................................................33

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ................59

*Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999)..................45

*Highmark Inc. v. Allcare Health Management Systems, Inc.*,
    134 S. Ct. 1744 (2014).....................................................................48

*Holmes v. South Carolina*, 547 U.S. 319 (2006) .....................................27

*In re Dell Inc., Securities Litigation*, 591 F. Supp. 2d 877 (W.D. Tex.
    2008) ..............................................................................................60

*In re Martin Marietta Corp.*, 856 F.2d 619 (4th Cir. 1988) ..............41, 42

*Jama v. ICE*, 543 U.S. 335 (2005)..........................................................41

*Katyle v. Penn National Gaming, Inc.*, 637 F.3d 462 (4th Cir. 2011)..............59, 60

*Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001).......................41

*Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001) ...................................51

*Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014) .................59, 60

*Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013)....................................60

*Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87 (1995).................................49

*Sizemore v. Fletcher*, 921 F.2d 667 (6th Cir. 1990) ..................................53

*United States v. Aramony*, 88 F.3d 1369 (4th Cir. 1996) ......................................36

*United States v. Azubike*, 504 F.3d 30 (1st Cir. 2007)....................................52

*United States v. Belyea*, 159 F. App'x 525 (4th Cir. 2005).....................................38

*United States v. Boyd*, 54 F.3d 868 (D.C. Cir. 1995) ....................................56

*United States v. Bradley*, 644 F.3d 1213 (11th Cir. 2011) .........................................52

*United States v. Brainard*, 690 F.2d 1117 (4th Cir. 1982) ........................................52

*United States v. Brooks*, 111 F.3d 365 (4th Cir. 1997).........................................39

*United States v. Carey*, 120 F.3d 509 (4th Cir. 1997) ............................................41

*United States v. Caudle*, 606 F.2d 451 (4th Cir. 1979) ............................................33

*United States v. Clay*, 627 F.3d 959 (4th Cir. 2010) ................................................61

*United States v. Collins*, 415 F.3d 304 (4th Cir. 2005) ...............................................52

*United States v. Combs*, 379 F.3d 564 (9th Cir. 2004).........................................56

*United States v. Dodd*, 770 F.3d 306 (4th Cir. 2014) .............................................57

*United States v. Farinella*, 558 F.3d 695 (7th Cir. 2009)...................................53, 54

*United States v. Forlorma*, 94 F.3d 91 (2d Cir. 1996).........................................56

*United States* v. *Foster*, 982 F.2d 551 (D.C. Cir. 1993)..........................................36

*United States v. Francis*, 82 F.3d 77 (4th Cir. 1996)...............................................55

*United States v. Frederick*, 78 F.3d 1370 (9th Cir. 1996) ........................................51

*United States v. Gracia*, 522 F.3d 597 (5th Cir. 2008)............................................56

*United States v. Green*, 305 F.3d 422 (6th Cir. 2002)...........................................52

*United States v. Hornsby*, 666 F.3d 296 (4th Cir. 2012) ......................................51

*United States v. Iozia*, 13 F.R.D. 335 (S.D.N.Y. 1952)..........................................40

*United States v. Julian*, 469 F.2d 371 (10th Cir. 1972) ........................................39

*United States v. Leftenant*, 341 F.3d 338 (4th Cir. 2003)................................36, 47

*United States v. Lewis*, 10 F.3d 1086 (4th Cir. 1993)............................................55

*United States v. Lighty*, 616 F.3d 321 (4th Cir. 2010).........................27, 33, 52, 53

*United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997)......................................49

*United States v. Moussaoui*, 382 F.3d 453 (4th Cir. 2004) ...................................35

*United States v. Nixon*, 418 U.S. 683 (1974).....................................2, 8, 40, 41, 62

*United States v. Nosal*, 291 F.R.D. 403 (N.D. Cal. 2013) ...............................42, 43

*United States v. Olis*, 429 F.3d 540 (5th Cir. 2005) ..............................................60

*United States v. Rajaratnam*, 753 F. Supp. 2d 317 (S.D.N.Y. 2011)....................43

*United States v. Richardson*, 607 F.3d 357 (4th Cir. 2010) ............................39, 41

*United States v. Ruhe*, 191 F.3d 376 (4th Cir. 1999)............................................57

*United States v. Russell*, 971 F.2d 1098 (4th Cir. 1992) .......................................36

*United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007).......................................60

*United States v. Smith*, 451 F.3d 209 (4th Cir. 2006)............................................34

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) ...........................52

*United States v. Stahl*, 616 F.2d 30 (2d Cir. 1980)...............................................53

*United States v. Stein*, 488 F. Supp. 2d 350 (S.D.N.Y. 2007) .................................42

*United States v. Tucker*, 249 F.R.D. 58 (S.D.N.Y. 2008)..................................42, 43

*United States v. Turner*, 198 F.3d 425 (4th Cir. 1999) .............................................35

*United States v. Williams*, 632 F.3d 129 (4th Cir. 2011)............................28, 35, 37

*United States v. Wilson*, 118 F.3d 228 (4th Cir. 1997).............................................48

*United States v. Wilson*, 135 F.3d 291 (4th Cir. 1998) .............................................52

*United States v. Wright*, 665 F.3d 560 (3d Cir. 2012) ..............................................51

## STATUTES AND RULES

18 U.S.C.
        § 1512 ...........................................................................................................33
        § 3231 .............................................................................................................3
        § 3553 ...........................................................................................................25

28 U.S.C. § 1291 ...........................................................................................................3

Fed. R. Crim. P.
        Rule 16 ....................................................................................................41, 42
        Rule 17 ......................................................................................................*passim*

Fed. R. Evid.
        Rule 403................................................................................................14, 35, 36
        Rule 701................................................................................................48, 50
        Rule 702................................................................................................48, 49, 50
        Rule 803................................................................................................46

U.S.S.G. § 2B1.1................................................................................24, 27, 57, 58, 59

## OTHER AUTHORITIES

Gohara, Miriam S., *A Lie for a Lie*, 33 Fordham Urb. L. J. 791 (2006) .................30

Henning, Peter J., *Defense Discovery in White Collar Criminal
        Prosecutions*, 15 Ga. St. U. L. Rev. 601 (1999)............................................43

Leo, Richard A. & Richard J. Ofshe, *The Consequences of False Confessions*, 88 J. Crim. L. & Criminology 429 (1998) ...............................38

Morvillo, Robert G., et al., *Motion Denied*, 42 Am. Crim. L. Rev. 157 (2005)...........................................................................................................43

Ofshe, Richard J. & Richard A. Leo, *The Decision to Confess Falsely*, 74 Denv. U. L. Rev. 979 (1997) ...............................................................30

2 *Weinstein's Federal Evidence* (2d ed. 2015) .......................................36

2 *Wigmore on Evidence* (Chadbourn rev. 1983)....................................47

## INTRODUCTION

Michael Rand presented a substantial defense to each of the prosecution's charges in this case, which centered on whether complex accounting judgments Rand made as the Chief Accounting Officer of Beazer Homes USA, Inc. were improper, and whether Rand later obstructed justice to hide that accounting. Rand's effort to present a complete defense was fatally undercut by a series of rulings that skewed the evidence the jury was permitted to consider.

First and foremost, the prosecution was allowed to erase entirely from the record a key set of facts bearing on Rand's innocence. On March 23, 2007, Beazer received a grand jury subpoena about its mortgage origination business. In response, it hired outside counsel who came to believe, based on botched forensic analysis, that Rand began deleting hundreds of accounting-related emails with high-level Beazer personnel on March 23. Rand denied that false allegation when interviewed by Beazer's lawyers, although he acknowledged deleting other emails a week later—largely junk. Beazer fired him based on the false forensic evidence. It then fed this flawed evidence to the prosecution.

In April 2008, the government presented Rand with a summary of its case against him to induce him to cooperate. Crucially, the government adopted Beazer's false allegation that Rand mass-deleted emails with key Beazer personnel starting March 23. It showed Rand several putative examples. Faced with this

supposedly ironclad evidence of guilt, Rand would later tell the government what he thought it wanted to hear in several proffer sessions in an attempt to cooperate. According to the government, Rand "confessed" during those sessions.  JA2937.

At trial, in its rebuttal case, the prosecution was permitted to introduce wholesale evidence of Rand's supposed "confession."  The court, however, barred Rand from coherently explaining the circumstances surrounding his confession by forbidding him from telling the jury that the government and Beazer had presented Rand with *false* forensic evidence of email deletions prior to his alleged confession.  That left Rand unable to answer "the one question every rational juror needs answered:  If the defendant is innocent, why did he previously admit his guilt?"  *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).  In fact, the prosecution put the same question to the jury in closing:  "Why was he desperate [when he confessed]?  He didn't say."  JA3012.  Rand *had* an answer for the jury, but the jury was never permitted to hear and evaluate it.

Second, through a series of overlapping rulings, the court vitiated Rand's ability to present a complete defense to the accounting-fraud allegations.  To start, the court denied Rand pretrial access to specified Beazer accounting records through a third-party subpoena.  The court held that Rand could not satisfy the stringent standard for Rule 17(c) subpoenas applied by the Supreme Court in *United States v. Nixon*, 418 U.S. 683 (1974).  That was legal error.  That standard

- 2 -

properly governs Rule 17 subpoenas to the government, not to third parties, such as Beazer. Compounding that error, the court erroneously excluded testimony about evidence Rand was able to obtain—workpapers from Beazer's outside auditors showing that accounting transactions challenged by the government were, in fact, reasonably recorded—and it permitted the prosecution to present complex accounting issues to the jury entirely through lay witness opinion testimony. The result was a one-sided presentation of accounting evidence, which undoubtedly influenced the jury's verdict on all counts.

These and other errors, standing alone and cumulatively, violated Rand's constitutional right to "'present a complete defense.'" *Crane*, 476 U.S. at 690. They require reversal and a new trial.

## JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231. On June 3, 2015, the court entered judgment and Rand noticed his appeal. JA3316-3322. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.    Whether the district court violated Rand's constitutional right to present a complete defense by excluding all evidence and argument concerning emails Rand was falsely accused of deleting.

2.      Whether the accounting evidence presented to the jury was fundamentally skewed in the prosecution's favor as a result of the district court's rulings: (A) refusing Rand's pretrial request to subpoena accounting records material to his defense; (B) excluding testimony about records from outside auditors confirming the reasonableness of Rand's accounting; and (C) permitting the prosecution to introduce lay testimony about complex accounting issues.

3.      Whether the prosecution committed reversible misconduct in its summation by appealing to class prejudice, commenting on Rand's exercise of his Fifth Amendment privilege, and vouching for a key prosecution witness.

4.      Alternatively, whether the court miscalculated the loss to investors from Rand's conduct under the Sentencing Guidelines.

## STATEMENT OF THE CASE

### A.      The Prosecution's Allegations

In 2010, the prosecution charged Rand with accounting fraud based on his work at Beazer from 2000 to 2007 and with obstructing an investigation into Beazer's mortgage origination practices.  JA27-54.  During that time, Beazer was a Fortune 500 home-building company with operations around the nation.  JA1267, 1738.  Rand, a certified public accountant, was Beazer's Controller and later its Chief Accounting Officer.  JA27, 1431-1432.  He reported to Beazer's CEO and

CFO. JA1344-1345. Rand was the only Beazer employee ever charged. The prosecution presented three core sets of allegations:

1.    The prosecution's accounting allegations concerned earnings management, or alleged efforts to smooth Beazer's reported earnings over time so that Beazer would hit consensus—that is, report quarterly earnings that Wall Street analysts predicted. JA32-33, 505. The prosecution did not allege that Rand stole from the company or investors or otherwise benefited financially. Nor did it allege that Rand created fictitious entities or transactions. Instead, the earnings management allegations concerned timing—whether, for example, it was appropriate to recognize income in one quarter rather than another.

The alleged earnings management involved what the prosecution referred to as "cookie jar" accounting with respect to Beazer's "reserve accounts." JA32-33. As Beazer built homes, it accounted for expected future costs by creating reserve accounts. JA1258. For example, Beazer created a "cost-to-complete reserve" for each house it built to reflect the anticipated cost of outstanding work and invoices on that home (JA1275-1276), and "land reserves" to reflect anticipated costs other than building the house, like installing sewers and sidewalks (JA1719). Beazer's reserves and the company's reported earnings moved in opposite directions: Increasing reserves decreased reported earnings, and vice versa. JA1281.

Setting reserve levels is hardly an exact science and demands predictions based on a range of reasonable estimates. Nonetheless, the prosecution alleged that, at Rand's direction, Beazer improperly increased its reserves in some quarters (storing up "cookies" when earnings were high) and lowered them in other quarters ("raiding the cookie jar") in an effort to hit earnings targets.

2.    The prosecution also alleged that Rand improperly accounted for a specific transaction in 2006 involving model homes Beazer sold to and then leased back from GMAC, an investment company. JA29-32. Model homes are often the last set of homes sold in a subdivision; a sale-leaseback transaction is a common way for a homebuilder to secure cash by selling the model homes to a third party while continuing to use them as models. JA2088. There is no dispute the GMAC transaction was a real transaction: Beazer received $117 million for the model homes it sold. JA2089-2090, 2212-2213.

According to the prosecution, however, Beazer and GMAC had agreed that Beazer would share in any future profits ("upside") if the model homes appreciated in value before GMAC sold them, and that Rand did not disclose that agreement to Beazer's auditors. JA29-32. Under complex (and counterintuitive) accounting rules, a seller's "continuing involvement" in the homes may prevent the seller from immediately recognizing the net proceeds of a sale-leaseback as earnings. JA2519-2521. Like the reserve adjustments, the GMAC theory was about when

- 6 -

revenue should have been recognized (i.e., when Beazer sold to GMAC or when GMAC sold to a homeowner), not whether it should have been.

3.    The prosecution's obstruction-of-justice allegations centered on the theory that in 2007 Rand deleted thousands of emails over the week following Beazer's receipt of a grand jury subpoena.  The indictment alleged that "[f]rom … March 23, 2007"—when Beazer received the subpoena—to "about 4:22 p.m. on … March 30, 2007," Rand deleted "thousands of e-mail messages," including emails that purportedly "incriminat[ed]" Rand in "cookie jar accounting."  JA36.

The indictment also alleged that Rand lied about these deletions during a June 26, 2007 interview by Mike Brown, Beazer's outside counsel.  JA38-39. Based on computer forensic analysis performed by a vendor selected by Brown, Beazer and Brown concluded that Rand had, in fact, deleted thousands of emails after "March 23, 2007, including numerous emails from and to important accounting and finance personnel at Beazer."  JA39.  Rand's alleged lie to Brown about not deleting those emails was the central basis for count 9 of the indictment. Beazer fired Rand the day after the interview.  JA4624.

## B.    Rand's First Trial

In preparation for Rand's trial—a case involving an alleged sweeping, multi-year accounting fraud across Beazer's nationwide operations—the defense sought discovery of documents material to Rand's defense.  Specifically, Rand sought

- 7 -

leave to serve a Rule 17(c) subpoena on Beazer, a third-party. As relevant, Rand sought two categories of materials from Beazer.

First, Rand sought computer forensic evidence underlying the supposed ironclad proof of Rand's email deletions, including "backup tapes" of Beazer emails from March 2007, which the defense believed would demonstrate that Rand had not deleted many of the emails he was accused of deleting. Dkt.69, at 3.[1] Second, Rand sought specific records from "Beazer's accounting system"—called JD Edwards—because those records were necessary to show Rand's accounting was reasonable and justified and to put in context and to refute the prosecution's cherry-picked accounting records. *Id.*

The prosecution filed a response to Rand's request for a subpoena, arguing, among other things, that JD Edwards records were "not relevant." Dkt.70 ¶5. The prosecution, by contrast, had Beazer's full cooperation and access to JD Edwards for years to build its case against Rand. JA4545-4547. Rand's motion for a subpoena was denied. Dkt.101. The court held that Rand's requests did not satisfy the stringent test established in *United States v. Nixon*, 418 U.S. 683 (1974).

With the playing field tipped in its favor by these rulings, the prosecution proceeded to trial. It opened with its obstruction case, presenting testimony from Aaron Philipp of Navigant Consulting, Inc., the firm Brown had hired for Beazer's

---

[1]    "Dkt." citations refer to the district court docket.

internal investigation.  JA170, 174.  Philipp testified about two categories of email deletions:  deletions that allegedly occurred between March 23 and March 28 based on backup tape analysis ("March 23-28 deletions" or "backup tape deletions") and deletions that allegedly occurred largely on March 30 that were captured after Beazer implemented an electronic "dumpster" ("March 30 deletions" or "dumpster deletions").  *See* JA179, 181-184, 195-199.

Philipp told the jury that Rand had deleted 3,272 emails from March 23 to March 28.  JA195-198.  He reached that conclusion based on a comparison of backup tapes showing the emails in Rand's mailbox on March 23 and the emails in his mailbox on March 30—any emails that did not appear on the March 30 tape, Philipp testified, must have been deleted.  JA197-199.

The March 23-28 deletions featured prominently at the trial, providing a crucial link between the prosecution's accounting and obstruction allegations. Through Philipp, the prosecution introduced an 82-page chart said to be a "line-by-line inventory of all the messages" Rand deleted (JA197-198), and eighteen binders of deleted emails—dramatically presented to the jury on a cart at closing argument—most of which were between Rand and high-level Beazer personnel, including the CFO (JA199-208, 526-527, 558-559).  The prosecution confidently told the jury that Rand deleted these emails because "[h]e didn't want the government to find out about the accounting fraud."  JA529.  The defense

vigorously cross-examined Philipp about his forensic work (JA226-258), but it was hampered in that effort because of the court's earlier refusal to allow Rand to subpoena the backup tapes.

As to the challenged accounting, the prosecution relied heavily on isolated records it had mined from JD Edwards and on allegedly incriminating emails. *See, e.g.*, JA480-481. The prosecution also called several former Beazer employees as alleged co-conspirators, many of whom were not certified public accountants, who nonetheless offered lay opinion testimony that accounting adjustments Rand had directed were "not proper." *See, e.g.*, JA483-485.

Despite limitations on Rand's defense, the jury deliberated for 20 hours over four days. JA537-573. The jury returned a split verdict, convicting him on seven counts and acquitting on four. JA574-575. After trial, convinced he had been convicted in part based on false email deletion evidence, Rand moved to compel the prosecution to produce the backup tapes as *Brady* material. Dkt.179, at 21-22. The prosecution again opposed. Dkt.180, at 12. Rand's *Brady* motion was never adjudicated because a new trial was later granted due to juror misconduct. Dkt.198.

### C.    Rand's Renewed Efforts To Obtain Exculpatory Evidence

### 1.    Accounting records

In advance of the new trial, Rand again sought to subpoena Beazer to obtain records from JD Edwards—the same sort of records the prosecution had used at the first trial as purported evidence of fraud.  Dkt.215, at 1-2.  Rand explained at length why access to specified accounting records was necessary to defend himself.  *Id.* at 2-11.  The prosecution's own witness had acknowledged that assessing the reasonableness of adjustments to reserves requires knowing the level of reserves before and after the adjustments.  Dkt.229, at 2.  That information was *not* included in the prosecution's exhibits or its expanded file discovery but *was* contained in the records Rand sought.  Rand further explained that access to JD Edwards was vital because, for many accounting transactions, the prosecution relied on email evidence without producing or identifying accounting entries that corresponded to the emails.  *E.g.*, JA486-487; Dkt.229, at 3.  Rand's request was limited to the seven specific Beazer reserve accounts relied upon by the prosecution at the first trial.  Dkt.229, at 4-5.

The prosecution opposed Rand's request, citing the *Nixon* standard. Dkt.219, at 4.  It insisted that the records sought were irrelevant, despite the facts that the prosecution for years had used those records to build its case and that the prosecution was continuing to mine JD Edwards to locate information to use

against Rand. *See* Dkt.309-1, at 2-4; JA653 ("Per 1.23.2014 FBI Request").

Applying *Nixon*, the court again denied Rand's request. Dkt.314.

### 2.     False email deletions

Rand separately renewed his efforts to obtain the backup tapes from Beazer through a Rule 17(c) subpoena. Dkt.223. The prosecution again opposed, claiming this was a "fishing expedition." Dkt.232, at 2. This time, the court granted Rand's request. Dkt.241.

Review of the backup tapes by an expert confirmed what the defense had suspected: Rand did *not* delete thousands of emails immediately after receipt of the March 23 subpoena. The mass email deletions that Rand allegedly made from March 23-28 with key accounting personnel—that led to Rand being fired, that formed the basis for his alleged lies to Beazer's outside counsel, and that were a key basis for his conviction at the first trial—never happened.

In light of this stunning development, Rand moved to exclude Philipp from the second trial or for a *Daubert* hearing. Dkt.269. Over the prosecution's objection that there was "no legitimate reason" for a hearing (Dkt.275, at 5), the court scheduled a hearing to follow jury selection (JA725).

After that ruling, and just days before the new trial, the prosecution informed the defense that—for the first time in seven years—it had evaluated the backup tapes itself, rather than relying on Navigant's forensic analysis. Dkt.335, at 12.

Based on that examination, the prosecution dropped Philipp from its witness list and disclaimed any effort to prove the March 23-28 deletions. *Id.*; Dkt.330, at 1. The prosecution never explained why it had taken years to confirm the unreliability of Philipp's testimony in light of the serious concerns identified at the first trial, even after it had secured a *conviction* based on that testimony.

Instead, the prosecution attempted to erase all of this from the trial. Days before trial, it moved to strike parts of the indictment relating to the March 23-28 deletions, though it would continue to allege that Rand deleted emails on March 30. Dkt.330. At the same time, it moved to preclude Rand from introducing evidence or even mentioning the false accusations at the retrial. Dkt.332. The defense objected, identifying the many ways in which Rand would be foreclosed from presenting a complete defense absent such evidence. Dkt.341.

Perhaps most significantly, the defense needed to explain how the false accusations affected Rand's state of mind when he spoke with the government in 2008. Dkt.341, at 5-6. Rand had engaged in a reverse proffer and then a series of proffer sessions with the prosecution during its investigation. The defense expected that the prosecution would attempt to introduce Rand's statements from the proffer sessions as evidence he "confessed." *Id.* The defense explained that the accusation that the government had ironclad forensic evidence of email

- 13 -

deletions—including emails with high-level Beazer personnel—was pivotal to understanding the circumstances surrounding Rand's supposed confession. *Id.*

The court granted the prosecution's request. JA752, 779-781. The court ruled that "evidence or argument concerning the backup tape emails" was "irrelevant" and excludable under Rule 403 as "distracting" or "confusing" because the prosecution was no longer seeking to prove the March 23-28 deletions. JA780-781.

### D.    Rand's Second Trial

#### 1.    The prosecution's case-in-chief

In addition to dropping the count tied most closely to the March 23-28 deletions, the prosecution also abandoned its effort to prove Rand had committed securities fraud. Dkt.326; Dkt.338. It thus proceeded only with conspiracy charges (counts 1 and 2) and obstruction of justice charges (counts 6, 9, and 11).

#### *i.    Obstruction of justice*

The prosecution began again with obstruction, telling the jury Rand deleted emails "[b]ecause [he] was involved in his own criminal accounting scheme." JA824. Without any mention of the false email deletions, the prosecution introduced evidence that Rand deleted approximately 6,000 emails on March 30. JA1219. The prosecution identified ten emails deleted that day that were relevant to the mortgage origination investigation. JA882-903. The prosecution also

attempted to show that Rand deleted emails after being informed by Deborah Danzig, an in-house lawyer, that he needed to retain all emails (JA974-975), and that Rand misled Brown about the deletions and his conversations with Danzig at the June 26, 2007 interview (JA1071-1077).

### ii.    Reserve adjustments

The prosecution again called several former Beazer employees who testified that Rand directed them to increase and decrease Beazer's reserve accounts "improperly," though not one of them was an expert in accounting. JA1290, 1517-1518, 1678-1679, 1744, 1874. These co-conspirators also testified about emails between them and Rand about earnings targets—for example, that a quarter's earnings were "too high." JA1319. The prosecution attempted to tie the emails to accounting entries showing increases or decreases to reserves. JA1538-1540. The core of the prosecution's theory was that, at Rand's direction, Beazer fraudulently increased its reserves in the early 2000s, and decreased them in 2006 when the housing market collapsed—all to hit consensus.

### iii.    The GMAC sale-leaseback transaction

The prosecution attempted to show that Beazer had "continuing involvement" in the model homes it sold GMAC by demonstrating that GMAC was "obligated to share" any appreciation in the model homes with Beazer. JA2949-2950. If Beazer had "continuing involvement," then it would have to wait

until GMAC sold the homes to final purchasers before Beazer could report its net profits from the transaction.  The prosecution pointed to emails in which Rand informed Beazer colleagues that Beazer could share in the "upside," but this "handshake deal" could not be written down "for accounting reasons" and Beazer's accountants would "not allow" it.  JA4145, 4151.  A Deloitte auditor testified that he was not aware of these emails when he signed off on Rand's accounting.  JA2079-2080.  The prosecution also introduced evidence that Beazer's contract with GMAC referenced a "property management agreement" (JA3981), and that GMAC's Property Management Agreement with a third party discussed splitting future profits with Beazer (JA4016-4017).

## 2.    The Defense Case

The defense put on a substantial case, calling nine witnesses over two days, and cast reasonable doubt on each set of the prosecution's allegations.

### i.    *Obstruction of justice*

The defense called into question whether Rand made the March 30 deletions with intent to obstruct the mortgage origination investigation.  Even the prosecution's witness identified only ten deleted emails, out of several thousand, potentially relevant to the investigation—thin evidence of intent.  None of those ten showed Rand directing improper accounting activity.  JA863, 3342-3348,

- 16 -

3357-3358, 3365, 3369-3371, 3381-3384, 3814.  To the contrary, several showed Rand policing and enforcing rules.  *E.g.*, JA3347, 3381, 3383.

In addition, the defense pointed to forensic evidence consistent with the theory Rand's March 30 email deletions were not tied to the investigation.  For example, Rand deleted "flirty emails" with friends (JA1162, 2352-2353, 4449); emails with various people with the first name "Lisa" (JA1239); emails to a former coworker, which Rand rarely kept (JA925, 2362-2363); emails about "girls scout cookies" and "JCC softball" (JA1245); and hundreds of emails Rand had never even read (JA2358).

With respect to Rand's alleged lies in the June 26 interview, Brown agreed that—over the course of the interview—Rand was forthcoming.  JA1148-1153, 1161-1162.  Rand's truthfulness was corroborated by a contemporaneous interview memorandum prepared by Brown's associate.  JA3418-3422.  The memorandum explains that Rand could not recall precisely when he learned of the grand jury subpoena or spoke to Danzig.  JA3421.  The defense was not allowed to ask Brown about the false email deletions or the forensic analysis performed by the firm he had hired.

### ii.  *Reserve adjustments*

Even without access to key accounting records, the defense cast reasonable doubt on the government's earnings management allegations.

- 17 -

***First***, Rand put the size of the challenged adjustments in context. The bulk of the prosecution's evidence related to reserve increases in the early 2000s, which decreased Beazer's reported earnings. In total, the challenged adjustments amounted to $2.5 million in 2001 and 2002 (JA3728-3731, 3735-3738, 3741-3747, 3771-3775, 3782-3787, 3801, 3805, 3808), or less than 1.27% of Beazer's pretax profits for those years (JA4305). Despite those adjustments, Beazer continued to substantially *exceed* Wall Street's profit expectations (JA2618-2619, 3330)—a fact inconsistent with the prosecution's theory that Beazer was storing away "cookies" to bring Beazer's earnings in line with Wall Street targets.

In 2006, when Beazer supposedly decreased reserves to increase earnings for the purpose of hitting Wall Street targets, the figures involved were still immaterial. The challenged reserve adjustments that year totaled $18.8 million of increased earnings and altered Beazer's annual profits only by 3%. *Compare* JA3834-3872, 3878-3887, 3891, 3896-3900, *with* JA4362, 4376. Moreover, Rand showed that, even without the challenged adjustments, Beazer's earnings would still not have hit Wall Street's expectations (exceeding them in the first two quarters and falling short in the third quarter). JA2620-2625.[2] Those facts again

---

[2]    Beazer had also missed consensus in the second quarter of 2005; the government introduced no evidence of any alleged accounting adjustments to increase earnings in that quarter. JA2619-2620, 3330.

undercut the government's theory that Rand was adjusting reserves to hit consensus, rather than for bona fide accounting reasons.

**Second**, Rand showed that many of the challenged reserve decreases in 2006 would have occurred for other reasons that year anyway, so that the prosecution's 2006 case rested largely on the contention that certain adjustments occurred in the wrong quarter of the right year. For example, the government highlighted Rand's instructions to several divisions to decrease certain cost-to-complete reserves to zero in the first quarter of 2006. JA1529. But Rand showed that the same reserves would have been decreased to zero later in the year anyway, without his instructions, after the underlying homes were sold. JA1312, 1533, 1872-1873.

Similarly, the government challenged decreases to land reserves in Southern California in the third quarter of 2006.[3] Land reserves could be appropriately reduced after certain criteria were met involving bonds associated with the land. JA1479-1480, 1786. Rand showed that these criteria were met in 2006 for many of Beazer's projects in Southern California, justifying land reserve decreases that year. JA1785-1788, 4498, 4506-4508. The prosecution's witness, Marilyn Andrea, testified that she wanted to decrease approximately half these lands reserves even earlier, in the first quarter of 2006. JA1755-1758.

---

[3]     The prosecution's evidence showed that these reserves were proper when first established—not the product of any alleged inflation. JA1742, 1757-1758.

**Third**, Rand introduced evidence that his accounting was objectively reasonable.  Prosecution witnesses acknowledged that setting reserves is a matter of judgment both as to amount and timing because reserves, by definition, reflect uncertain predictions about future costs.  JA1277, 1434-1435.  There is not a single level at which a reserve must be set, but a reasonable range.  JA1434-1435, 1610, 1903-1904.  The prosecution did not try to establish what that reasonable range was for *any* of the challenged adjustments, or whether *any* of Rand's adjustments pushed Beazer's reserves beyond that range.

Moreover, although the prosecution's witnesses described particular adjustments as "improper," *supra* p.15, Rand introduced evidence showing that he sometimes directed accounting adjustments at a particular division based on his judgment of what Beazer's overall reserves should be across its consolidated balance sheet—information that Rand's subordinates at the division-level did not have.  JA21377-1379, 1394-1395, 1664, 2411-2412.  Rand's efforts to demonstrate that point, however, were hamstrung by his inability to access JD Edwards, which contained company-wide data Rand had available to him at the time when he was making challenged accounting judgments.

**Fourth**, unlike the government's case, Rand's defense was backed by expert testimony.  His accounting expert testified, for example, that Rand's cost-to-complete reserve adjustments accurately predicted Beazer's actual increases and

decreases in future costs (JA2505-2512), and that challenged decreases in land reserves in 2006 were similarly appropriate given Beazer's actual costs (JA2518-2519). However, the court prohibited Rand's expert from testifying about the contemporaneous workpapers of Beazer's outside auditors, which would have confirmed Rand's theory that the challenged adjustments never caused Beazer's reserves to be unreasonable. JA2474-2476.

### iii.     *The GMAC sale-leaseback transaction*

Finally, the defense cast substantial doubt on the allegation that Beazer had "continuing involvement" in the model homes. On cross-examination, Beazer's auditor agreed that Beazer's contract with GMAC did not give Beazer a contractual right to share in future appreciation of the model homes (JA2103)—the key issue governing whether there was continuing involvement. And the lawyer who drafted both Beazer's contract with GMAC and GMAC's property management agreement (on which the government hung its case (JA2948-2950)) testified that neither agreement was intended to give Beazer any contractual right to share in future appreciation. JA2736-2737, 2740. Rand's accounting expert testified that, because Beazer had no such contractual right, Rand's accounting was proper. JA2521-2522.

### 3.    The prosecution's rebuttal

By the time the defense rested, there was ample evidence from which the jury could have formed reasonable doubt. Despite the volume of evidence presented, there were critical gaps in the prosecution's case.

On rebuttal, however, the prosecution was allowed to attempt to plug the gaps by introducing evidence that Rand "confessed." FBI Agent Doug Curran testified that statements Rand made to him during the proffer sessions in 2008 (which were not recorded or transcribed) constituted an admission by Rand of "his role in the illegal earnings management side of the case." JA2765. Curran told the jury that Rand described his own conduct as "illegal." *E.g.*, JA2765, 2778-2784. According to the prosecution, Rand "confessed." JA2937.

There were many reasons to doubt Curran's account of those proffer sessions.[4] But, crucially, the defense sought to introduce key evidence of the circumstances surrounding the "confession" to show that Rand made any confessional statements not because he believed his conduct was illegal but because he felt compelled, in view of the false-email deletion evidence, to

---

[4]    For example, Curran reviewed his memoranda summarizing Rand's proffers prior to testifying, although he claimed not to rely on them. JA2818. The memoranda themselves were written weeks after the interviews (JA2820-2821), and were missing exculpatory and explanatory statements that were contained in Curran's handwritten notes (JA2808-2810). And, despite claiming that Rand "confessed," even Curran acknowledged that the tone of the proffer sessions changed over time as Rand defended his accounting judgments. JA2769-2770.

implicate himself in a misplaced effort to tell the FBI "what he thought … they wanted to hear" to receive leniency.  JA2978.

The court again refused to permit Rand to introduce evidence or argument about the false email accusations.  The court was emphatic that the defense could not put before the jury a critical piece of evidence—that the March 23-28 deletion accusations, supposedly backed by airtight forensic analysis, were *false*—to explain why Rand would seemingly implicate himself if he was innocent.  *E.g.*, JA2666.

Here is what Rand would have put before the jury:  At the June 26 interview, Rand acknowledged deleting some junk emails, as well as innocuous emails with a colleague.  He also truthfully denied deleting emails with high-level Beazer personnel.  However, Brown, having just learned of the forensic analysis by Philipp (JA3427), accused Rand of "false[ly]" denying mass email deletions.  Beazer in turn fed that information to the prosecution.  In a later reverse proffer, the prosecution told Rand it had forensic evidence that he had deleted accounting-related emails.  It was that reverse proffer and the weight of alleged evidence purportedly showing Rand had mass-deleted deleted emails the week following the subpoena that prompted Rand's statements to the government.  The jury heard none of this.

- 23 -

### 4.    Closing arguments

Without the opportunity to explain the circumstances surrounding Rand's confession, the defense was left in its closing to tell the jury only that Rand was "desperate." JA2978. The defense could not explain why that was so. Even so, defense counsel summarized for the jury how the prosecution had failed to shoulder its burden of proof with respect to charges against Rand. JA2972-2977, 2982-3008.

In a short rebuttal summation, the prosecution made a series of prejudicial remarks, including references to Rand's alleged wealth (JA3010, 3012, 3023); an improper effort to vouch for the credibility of Curran (JA3011); and an impermissible comment on Rand's failure to testify (JA3012).

On that record and without the benefit of key evidence putting Rand's alleged confession in context, the jury deliberated for five hours and convicted Rand on all counts. JA3076-3086.

### E.    Sentencing

At sentencing, the prosecution argued that the recommended guidelines sentence was 75 years' imprisonment. JA3273; SJA27-28, 32. That was largely based on U.S.S.G. § 2B1.1, which increased the recommended sentence based on the alleged loss to Beazer's shareholders after the "fraud was disclosed."

The court held that Rand's fraud was disclosed to the market in June and August 2007 (JA3277-3281), and, based on analysis of shareholder losses after those disclosures, it calculated the guidelines sentence as life imprisonment, capped by a statutory maximum of 75 years (JA3281-3286). Applying the 18 U.S.C. § 3553(a) factors, the court imposed a 10-year sentence. JA3305.

## SUMMARY OF ARGUMENT

I.      The Constitution gave Rand the right to a meaningful opportunity to present a complete defense. The district court deprived Rand of that right by erroneously barring Rand from introducing any evidence or argument that for years, including at the first trial, Rand had been accused, based on botched forensic analysis, of deleting emails the week after Beazer received the March 23 subpoena.

The exclusion of that evidence crippled Rand's defense in multiple ways. First, it stripped Rand of his constitutional right to explain "the circumstances that prompted his confession." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). Rand was prepared to testify that his alleged confession—which the government introduced on rebuttal to remedy the reasonable doubt the defense had created— was not sincere but was made out of desperation in light of the supposed ironclad evidence of email deletions the government claimed to have. Second, the court's ruling deprived Rand of the ability to defend himself against count 9, which was based principally on allegedly false statements Rand made about the March 23-28

deletions at his June 26 interview.  Finally, Rand's ability to cross-examine Beazer witnesses was seriously undermined as Rand was not able to explore whether false accusations against Rand—which had been publicly known for years and which featured prominently at the first trial—tainted or biased their view of Rand.

II.     The court separately vitiated Rand's ability to present a complete defense through a series of discovery and trial rulings that distorted the accounting record eventually presented to the jury.  Applying the wrong legal standard, the court barred Rand from obtaining material accounting records from Beazer before trial.  Compounding that error, the court wrongly excluded highly relevant evidence about the workpapers of Beazer's outside auditors, showing that Rand's accounting decisions were proper and thus countering any inference of wrongful intent.  Finally, the court erroneously permitted the government to present its highly complex accounting fraud case—the proper domain of expert testimony—to the jury on the basis of lay opinion testimony.  The result of these rulings was an accounting case based on incomplete and one-sided accounting evidence.

III.    The prosecution committed reversible conduct in its rebuttal closing argument.  In an effort to ensure a conviction, the prosecution made a number of improper remarks during its rebuttal.  Seeking to stir class prejudice, the government appealed eight times to Rand's wealth, effectively telling the jury Rand was a rich man trying to buy his way out of trouble.  It also commented,

directly and indirectly, on Rand's failure to testify and vouched for the credibility of a key, indeed perhaps *the* key, prosecution witness.

IV.    At sentencing, the court erroneously applied sentencing enhancements under U.S.S.G. § 2B1.1 and wrongly calculated the recommended guidelines sentence as 75 years' imprisonment.  That error was based on a legally incorrect understanding of what constituted a disclosure of fraud under the Sentencing Guidelines.  Had the court correctly applied § 2B1.1, the guidelines recommended sentence would have been 30-37 months' imprisonment.  This Court should vacate the sentence and remand to the district court for resentencing.

## ARGUMENT

**I.    EXCLUSION OF THE FALSE EMAIL ACCUSATIONS VIOLATED RAND'S CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE**

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"  *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006).  That "right includes 'at a minimum, … the right to put before a jury evidence that might influence the determination of guilt.'"  *United States v. Lighty*, 616 F.3d 321, 358 (4th Cir. 2010).  Here, the district court vitiated Rand's constitutional right by precluding him from presenting any evidence or argument about the false email deletion accusations the prosecution and Beazer had leveled against him for years—accusations that were manifestly relevant and, indeed, critical, to a fair evaluation of the prosecution's case.  "This Court reviews

evidentiary rulings implicating constitutional claims de novo." *United States v. Williams*, 632 F.3d 129, 132 (4th Cir. 2011).

## A. The Excluded Evidence Was Necessary For Rand To Have A Meaningful Opportunity To Defend Himself

The trial court's refusal to permit any evidence or argument about the false email deletions compromised Rand's ability to present a defense in three different ways: It prevented Rand from introducing evidence of the circumstances surrounding his alleged confession; it undermined Rand's ability to contest count 9 (alleging Rand lied about email deletions to Brown); and it unfairly restricted Rand's right to cross-examine key prosecution witnesses.

### 1. Rand was prevented from coherently explaining the circumstances surrounding his alleged confession

The prosecution was permitted to use Rand's "confessional" proffer statements against him, without Rand ever having an opportunity to put before the jury a key piece of evidence to explain the circumstances leading to those statements or his state of mind at the time. The jury never learned that, prior to Rand's statements, the prosecution told Rand that it had state-of-the-art forensic proof that Rand began deleting emails on March 23, shortly after the grand jury subpoena, and that he continued to delete thousands of emails throughout the following week. These March 23-28 deletions supposedly included emails to and from high-level personnel at Beazer, including hundreds of emails to the CEO and

CFO.  At the time, Rand had already been terminated and had no access to his emails to verify or disprove the prosecution's allegation.  Rand was prepared to testify that he spoke to the prosecution only under the heavy weight of those false accusations, which caused him to feel compelled to implicate himself to obtain leniency for fear he would be wrongly convicted otherwise.  *Supra* pp.22-23.

As a result of the court's rulings, however, Rand was "stripped of the power to describe to the jury the circumstances that prompted his confession."  *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).  If a defendant cannot describe those circumstances to the jury, "the defendant is effectively disabled from answering the one question every rational juror needs answered:  If the defendant is innocent, why did he previously admit his guilt?"  *Id.*  Rand *had* an answer to explain his statements for the jury, but the jury was never allowed to hear and evaluate it.

The court's evidentiary ruling cannot be reconciled with *Crane*.  *Crane* held that it is "exclusively for the jury to assess" the probative weight to be given to a defendant's admissions, and that the circumstances leading to such admissions will often be "highly relevant"; indeed, the case may "stand or fall on [the defendant's] ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility."  476 U.S. at 688, 689.  The right to present a defense "would be an empty one" if a court could "exclude competent, reliable evidence

bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." *Id.* at 690.

The prosecution argued below that the false accusations formed only a small part of a "78-page power point" presentation the prosecution had made to Rand prior to his proffer statements. JA2661. But it is well established that false accusations—especially false *forensic* accusations—loom large in the mind of an innocent person.[5] Defense counsel explained that, from Rand's perspective, it was as though the prosecution had told him it had "DNA evidence" that he committed a crime he did not commit. JA2665. Ultimately, evaluating the weight in Rand's mind of the false accusations is for the jury, which should have been allowed to consider "the circumstances that prompted the confession." *Crane*, 476 U.S. at 689.

Rand repeatedly advised the court as much, explaining that he was entitled to present "[e]vidence that government agents represented that they had ironclad evidence of his guilt," now "known to be false," if the prosecution introduced statements prompted by those false accusations. Dkt.341, at 5-6. The issue came to a head at trial after the court ruled that the prosecution would be permitted to introduce Rand's proffer statements in the prosecution's rebuttal case. JA2658;

---

[5]    *See, e.g.*, Gohara, *A Lie for a Lie*, 33 Fordham Urb. L. J. 791, 817-818 (2006) ("When a suspect is confronted with seemingly incontrovertible evidence of his guilt, he is likely to conclude that he is certain to be convicted even though he is innocent."); Ofshe & Leo, *The Decision to Confess Falsely*, 74 Denv. U. L. Rev. 979, 1023 (1997) (evidence supposedly based on "technical or modern scientific procedures" is "likely to be more influential" in inducing false confessions).

*supra* p.22.  The court then ruled that it would allow Rand to "testify as to why he was induced into proffering," but that he could only "do that without reference to the fact that years later some of the information that he was confronted with turned out to be false."  JA2664.  In the court's view, the actual falsity of the accusations had "nothing to do with [Rand's] state of mind," because he was unaware of the botched forensics at the time.  JA2665-2666.

But that remedy could not possibly have satisfied Rand's constitutional right to place his alleged confession in its proper context.  If Rand had testified as the court suggested—that he spoke to the prosecution after the prosecution told him it had forensic proof that he deleted thousands of accounting-related emails to cover up an accounting fraud—the jury's natural inference would be that Rand was *guilty*.  Under the circumstances of this case, evidence that Rand was accused of deleting emails that he did not delete, and that those accusations weighed heavily on his mind when he spoke to the prosecution, could not fairly be evaluated without the jury learning that the accusations in fact, were, *false*.  *Crane* entitled Rand to put that explanation before the jury.

> **2.    Rand was prevented from proving that his statements at the June 26 interview were not misleading**

Independently, the court's ruling deprived Rand of a meaningful chance to defend himself against count 9, which charged him with "knowingly and corruptly engag[ing] in misleading conduct" during the June 26, 2007 interview led by

Beazer's outside counsel, Brown.  JA52.[6]  Because of the court's exclusionary rulings, Rand could not introduce evidence that he truthfully denied deleting the March 23-28 emails during that interview.

The prosecution's original theory of count 9—alleged in the indictment and recounted by Brown at the first trial—was that, after back and forth, Rand had told investigators that he recalled deleting some emails that he believed were largely junk, "similar to advertisements for the drug Viagra," as well as some emails from particular "non-essential" Beazer employees, including colleague Cory Boydston. JA38.  As Brown was returning to his car to leave, he "received a call from another … lawyer[] indicating that we had determined preliminarily that [Rand] had deleted not just Cory Boydston's e-mails, but a large number of e-mails involving" the current and former CFOs and the CEO.  JA322-323.  Brown "immediately returned … and confronted [Rand] with the false statements he had made earlier that day regarding the content of the e-mails deleted," but Rand "offered no corrections."  JA39; *see* JA323-324.

Over Rand's continuing objection (JA1135), the court permitted the prosecution to erase entirely that latter part of the June 26 interview from the record.  The prosecution's examination of Brown simply stopped in time, as

---

[6]     Count 11 incorporated by reference the June 26 interview allegations.  Thus, evidence that Rand's interview statements were not misleading would have been exculpatory as to count 11.

though the second half of the interview had not happened. JA1070-1077. And a memorandum prepared by Brown's team was *redacted* to omit Brown's false accusation (and Rand's truthful denials)—memorialized in all bold type in the original—before the memorandum was shown to the jury. *Compare* JA3422 *with* JA3427; *see also* JA1134.

Rand had the right to put before the jury "evidence that might influence the determination of guilt." *Lighty*, 616 F.3d at 358. Counts 9 and 11 required proof of corrupt intent. 18 U.S.C. § 1512(b)(3), (c)(2). Had the jury learned that Rand truthfully denied the March 23-28 email deletions at the interview, the jury may have concluded, in view of Rand's overall conduct at the interview, that Rand did not intend to mislead Brown or to hinder a grand jury investigation.

Separately, evidence that Brown wrongly accused Rand of deleting emails would have been relevant to the jury's evaluation of Brown's credibility and bias. Inquiring into such matters is an "important function of the constitutionally protected right of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 316-317 (1974); *see United States v. Caudle*, 606 F.2d 451, 457 (4th Cir. 1979) ("full cross-examination of a witness … is [a] right, not [a] mere privilege"). Given Brown's lead role in the false accusations against Rand, Brown had a substantial personal stake in ensuring that his own mistakes—in hiring Navigant, relying on its result, and falsely charging Rand—did not derail the prosecution.

- 33 -

### 3.    Rand was prevented from effectively cross-examining former Beazer employees

Finally, the court's prohibition on evidence or argument regarding the false email deletions violated Rand's right to "a reasonable opportunity to conduct cross-examination" of other witnesses. *United States v. Smith*, 451 F.3d 209, 221 (4th Cir. 2006). Denial of that right "calls into question the ultimate 'integrity of the fact-finding process.'" *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973).

Rand sought to cross-examine the Beazer witnesses who testified for the government about whether they had heard that Rand was accused of deleting hundreds of emails with high-level personnel starting March 23; whether they knew that accusation had now been shown to be false; and whether the false accusation had colored their views of Rand's conduct—for example, causing them to believe that Rand's accounting must be improper if he sought to cover it up.

The prosecution acknowledged before the retrial that at least two of its witnesses had reviewed and discussed the first trial transcript—a trial at which the March 23-28 deletions featured prominently. Dkt.335, at 13. The defense drew that bare fact out on cross-examination. JA1040, 1443-1444. But the court forbade the defense from asking any follow-up questions about the false email deletion accusations. It is possible, if not likely, that those witnesses testified under the mistaken impression Rand had engaged in mass-email deletion the week following the grand jury subpoena.

The potential taint went well beyond these witnesses.  Beazer had publicly announced at time of Rand's termination that he was fired for deleting emails (JA4624), and the prosecution had announced that Rand was convicted for deleting "emails containing evidence of his accounting fraud" after the first trial (Dkt.335, at 18 n.9).  In each case, the core allegation was premised almost entirely on the March 23-28 deletions.  Rand did not have the opportunity to cross-examine *any* of the prosecution's witnesses about whether and how these false accusations biased their views of Rand's conduct.

### B.    There Was No Ground To Exclude The Evidence

The exclusion of this critical evidence cannot be defended as garden-variety exercise of the trial court's discretion.  Although district courts possess "wide latitude" over the presentation of evidence, that discretion is cabined by the right to present a defense.  *United States v. Turner*, 198 F.3d 425, 429 (4th Cir. 1999).  When "'important defense evidence' is excluded … in a manner that is 'disproportionate to the ends that [the rationale for exclusion is] asserted to promote'—it may violate a defendant's constitutional rights."  *Williams*, 632 F.3d at 132; *see United States v. Moussaoui*, 382 F.3d 453, 471 (4th Cir. 2004).

Neither of the court's rationales for exclusion withstands scrutiny.  The court stated that evidence was "irrelevant" or, if relevant, excludable under Rule 403 as potentially "confusing" or "distracting" to the jury.  JA780-781.

The excluded evidence was clearly relevant to the circumstances leading to Rand's proffer sessions and his state of mind at the time, to Rand's conduct at the June 26 interview, and to witness bias and credibility. Relevance is "a low barrier to admissibility," *United States v. Leftenant*, 341 F.3d 338, 346 (4th Cir. 2003), and was easily satisfied here. In particular, as *Crane* holds, the circumstances surrounding a confession bear directly on "the one question every rational juror needs answered": Why did an innocent person confess? 476 U.S. at 689.

As to Rule 403, "the balance under [the rule] should be struck in favor of admissibility, and evidence should be excluded only sparingly." *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996); *United States v. Russell*, 971 F.2d 1098, 1106 (4th Cir. 1992) (court must "look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect"). Although Rule 403 permits exclusion of evidence of "marginal significance," it is an abuse of discretion to exclude evidence "essential" to the defense. *United States* v. *Foster*, 982 F.2d 551, 553, 555 (D.C. Cir. 1993). Thus, regardless of any Rule 403 concerns, exclusion of this crucial state-of-mind evidence was "an abuse of discretion." 2 *Weinstein's Federal Evidence* § 403.06[2], at 403-85 (2d ed. 2015).

In any event, the only Rule 403 concern identified was "the potential for jury confusion." JA781. But neither the court nor the prosecution explained why jurors

- 36 -

would be confused by learning that Rand made allegedly confessional statements only under the heavy weight of false accusations of mass email deletions. That is an easily understandable situation. The prosecution alleged a complex, multi-year accounting fraud; the evidence Rand sought to put before the jury was straightforward by comparison.

### C.  The Erroneous Exclusion Was Not Harmless

When an evidentiary ruling violates a defendant's right to present a defense, a verdict must be set aside unless "a reviewing court is able to determine that 'the constitutional error was harmless beyond a reasonable doubt.'" *Williams*, 632 F.3d at 132. The assessment of harmlessness must take account of the "indelible impact a full confession may have on the trier of fact." *Arizona v. Fulminante*, 499 U.S. 279, 313 (1991) (Kennedy, J., concurring).

The prosecution cannot satisfy that standard here. The trial court's exclusion of any mention of the false email accusations hamstrung the defense's ability to cross-examine, to expose bias, or to undermine the credibility of key prosecution witnesses. Standing alone, that error was not harmless.

Wholly apart from that prejudice, Rand's inability to explain, coherently, to the jury the circumstances surrounding his confession was likely outcome-determinative. Introduction of the alleged "confession" in rebuttal was a pivotal moment, in light of the reasonable doubt that had been created. *See supra* pp.22-24.

The prosecution understood as much, telling the jury "[t]he whole case is over" if the jury believed Curran.  JA3013.  Indeed, Rand's inability to explain why he felt compelled to implicate himself undoubtedly colored the jury's view of *all* of trial evidence:  "[B]ecause a confession is universally treated as damning and compelling evidence of guilt, it is likely to dominate all other case evidence[.]" Leo & Ofshe, *The Consequences of False Confessions*, 88 J. Crim. L. & Criminology 429, 429 (1998); *United States v. Belyea*, 159 F. App'x 525, 530-531 (4th Cir. 2005) (per curiam) (remanding for hearing on exclusion of false confession expert, where the "confession was crucial to [the] conviction").

## II.    OVERLAPPING DISCOVERY AND EVIDENTIARY RULINGS ERRONEOUSLY DEPRIVED RAND OF THE ABILITY TO DEFEND AGAINST THE PROSECUTION'S ACCOUNTING CASE

The prosecution charged Rand with a sweeping accounting-fraud conspiracy, involving highly complicated accounting transactions over a nearly eight-year period at Beazer divisions across the country.  In such a case, one would think that the prosecution would have an interest in ensuring that the jury was presented with an accurate picture of the complex accounting underlying this case.

That manifestly did not occur here.  Instead, the jury was presented with a decidedly distorted view of the underlying accounting.  Through a series of discovery and evidentiary rulings by the trial court, at the prosecution's behest, Rand was denied access to JD Edwards accounting records vital to his defense; he

was barred from introducing highly probative evidence of the reasonableness of his accounting decisions; and the prosecution was given free rein to use lay opinion testimony as a substitute for expert testimony. As a result of these overlapping errors, the accounting evidence presented to the jury was severely slanted. This Court should order a new trial on a level playing field.

The standard of review is abuse of discretion. *United States v. Richardson*, 607 F.3d 357, 368 (4th Cir. 2010) (discovery rulings); *United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997) (evidentiary rulings). Application of "an erroneous legal standard" is an abuse of discretion. *Richardson*, 607 F.3d at 368.

### A. The District Court Wrongly Denied Rand Access To Relevant Accounting Evidence From Beazer

From the outset of this case, Rand's ability to defend himself was handicapped by his inability to access accounting records—the heart of an accounting case—to prove his defense. Rand's request for a Rule 17(c) subpoena to Beazer to obtain specific accounting records from JD Edwards was denied on the ground that Rand failed to satisfy the stringent *Nixon* standard. Dkt.228, at 1-2; Dkt.314, at 2 & n.2. That was legal error. The *Nixon* standard—adopted in the context of a subpoena to the prosecution—does not apply to Rule 17(c) subpoenas to third parties, such as Beazer. The remedy for such a discovery error is a new trial. *E.g.*, *United States v. Julian*, 469 F.2d 371, 377 (10th Cir. 1972).

### 1.  *Nixon* does not apply to third-party Rule 17(c) subpoenas

A defendant may issue a subpoena *duces tecum* to compel the production at trial of "books, papers, [or] documents" for the defense.  Fed. R. Crim. P. 17(c)(1).  The defendant may also seek the court's permission to compel the production of those materials before trial, as Rand did here.  *Id.*  Under the text of Rule 17(c), the subpoena may be quashed *only* "if compliance would be unreasonable or oppressive."  Fed. R. Crim. P. 17(c)(2).  Rand's request for a pretrial subpoena to Beazer was not unreasonable or oppressive and should have been granted.

The trial court denied Rand leave to issue the pretrial subpoena on the ground that his request failed to satisfy the test applied by the Supreme Court in *Nixon*.  In that case, the Court held:

> [I]n order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

418 U.S. at 699 (footnote omitted).  The Court summarized those requirements as "(1) relevancy; (2) admissibility; (3) specificity."  *Id.* at 700.

However, that test was drawn from cases involving subpoenas *to the prosecution*, not third parties.  *See Nixon*, 418 U.S. at 699 (citing *United States v. Iozia*, 13 F.R.D. 335, 338 (S.D.N.Y. 1952)).  As the Supreme Court previously had

explained, discovery from the prosecution is carefully governed by Rule 16, and the drafters of the Federal Rules did not intend "to give a limited right of discovery" in *Rule 16* only to have those limits swallowed by *Rule 17*. *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951). In *Nixon*, the Court acknowledged that the rationale for limiting Rule 17(c) subpoenas to the prosecution may *not* apply "when the subpoena … is issued to third parties," but it declined to decide "whether a lower standard exists" in that case because even the higher standard was satisfied. *Id.* at 699 n.12.

For three reasons, this Court should resolve the question left open in *Nixon* and hold that pretrial subpoenas to third parties should issue unless they are unreasonable or oppressive.[7]

*First*, the text of Rule 17(c) dictates that result and "the plain words of the Rule are not to be ignored." *Bowman*, 341 U.S. at 220; *see United States v. Carey*, 120 F.3d 509, 512 (4th Cir. 1997) ("[W]e are bound to apply the rule in the manner in which it is written."). There is no basis for adding additional requirements, such as "specificity," not set forth in the text of the Rule. *Cf. Jama v. ICE*, 543 U.S.

---

[7]    This Court has applied *Nixon* to a third-party subpoena. *E.g.*, *Richardson*, 607 F.3d at 368; *In re Martin Marietta Corp.*, 856 F.2d 619, 621 (4th Cir. 1988). However, the Court does not appear to have considered the argument that a lower standard should apply, and thus its prior invocation of *Nixon* cannot be fairly read as a holding. "Judicial decisions do not stand as binding 'precedent' for points that were not raised, not argued, and hence not analyzed." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 557 (2001).

- 41 -

335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply[.]").

**Second**, as noted, the *reason* for applying a heightened standard to a Rule 17 subpoena to the prosecution does not apply to third-party subpoenas because there is no risk a defendant is circumventing Rule 16—as several courts have recently recognized. *See, e.g.*, *United States v. Nosal*, 291 F.R.D. 403, 407 (N.D. Cal. 2013) (collecting cases); *United States v. Tucker*, 249 F.R.D. 58, 62-66 (S.D.N.Y. 2008) (declining to apply the *Nixon* standard). Although many courts, often without discussion, have reflexively applied *Nixon* to third-party subpoenas, "it is vitally important never to let the frequent repetition of a familiar principle obscure its origins and thus lead to mindless application in circumstances to which the principle never was intended to apply." *United States v. Stein*, 488 F. Supp. 2d 350, 365 (S.D.N.Y. 2007).

**Third**, application of *Nixon*'s restrictive test is inconsistent with Rule 17(c)'s basic purpose of "implement[ing] the Sixth Amendment guarantee that an accused have compulsory process to secure evidence in his favor." *Martin Marietta*, 856 F.2d at 621. Indeed, this case well illustrates the prejudice flowing from application of *Nixon* to document-intensive cases. Where the outcome of a criminal case may turn on an extensive paper record, "requiring the defendant to specify precisely the documents he wants without knowing what they are borders

- 42 -

on rendering Rule 17 a nullity." *United States v. Rajaratnam*, 753 F. Supp. 2d 317, 321 n.1 (S.D.N.Y. 2011); *see also* Morvillo et al., *Motion Denied*, 42 Am. Crim. L. Rev. 157, 160 n.12 (2005) ("It is extraordinarily difficult for a defendant … to know enough about the discovery he is seeking such that he can comply with the *Nixon* requirements."); Henning, *Defense Discovery in White Collar Criminal Prosecutions*, 15 Ga. St. U. L. Rev. 601, 647 (1999) (similar).

In addition, extension of *Nixon* to third-party subpoenas has created a gross "disparity between criminal and civil cases in access to discovery." *Nosal*, 291 F.R.D. at 408. A "defendant on trial for his life or liberty" should have at least the right to obtain "documents 'material to his defense' from … third parties," as could easily be obtained under the civil rules. *Rajaratnam*, 753 F. Supp. 2d at 321 n.1. "Criminal defendants have the right to 'put before a jury evidence that might influence the determination of guilt.' To effect this right, a defendant must have the ability to obtain that evidence." *Tucker*, 249 F.R.D. at 65 (footnote omitted). Rule 17(c) should be construed consistent with those significant constitutional and policy concerns when the defendant seeks records from a third-party.

### 2.    Rand's request satisfied the correct Rule 17(c) standard

Under the correct legal standard, Rand's pretrial Rule 17(c) subpoena request should have been granted. Rand requested "accounting entries, budgets, budget entries, and financial reports" for seven specific categories of reserve

accounts in JD Edwards—the very accounts the prosecution had put at issue at the first trial—during the timeframe of the alleged conspiracy.  Dkt.234, at 2-3.  Rand's request was reasonably limited in time and scope to the accounts that the prosecution claimed had been used for improper earnings management.  And no showing was made that producing these records would have been "oppressive."

These records were material, if not vital, to Rand's defense.  JD Edwards contained multiple reports for subdivisions across Beazer that would have enabled Rand to demonstrate not just the reasonableness but even the necessity of the reserve adjustments at issue.  Having access to the company-wide information that was actually available to Rand at the time of the challenged adjustments, not merely the records cherry-picked by the government, was critical to Rand's theory that his accounting judgments reflected information not available to his subordinates whom he directed to make adjustments, and who later claimed at trial that the adjustments were "improper."  *Supra* p.15.  JD Edwards contained a wealth of information (land budgets, job cost reports, land transaction reports, account balance reports) to demonstrate the reasonableness of Rand's accounting judgments that company-wide reserves needed to be increased in the earlier years and then (with changed conditions, costs, and completed projects) decreased in later years.

In denying Rand's request under *Nixon*, the court appeared to fault Rand for failing to limit his request to "entries … at issue" in the prosecution's case. Dkt.314, at 3. Respectfully, that missed the point. Whether an accounting transaction is reasonable or unreasonable requires knowing reserve levels before and after an adjustment. *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 205 (1st Cir. 1999) (without information on "how the reserve changed over time, it is difficult to infer that [the defendant's] revenue recognition decisions were unreasonable"). The records Rand sought would have supplied necessary context to the prosecution's accounting entries and would have shown, for example, that those entries were based on correct or reasonable cost estimates, thus supplying evidence contradicting the prosecution's theory of wrongful intent. *See* JA2505-2512 (accounting evidence available to defense demonstrated objective reasonableness of multiple reserve adjustments).

### B. The District Court Wrongly Excluded Exculpatory Evidence

Compounding the court's threshold limits on Rand's ability to gather accounting evidence, the court erroneously barred Rand from introducing relevant evidence he was able to secure. Specifically, the court forbid Rand's accounting expert from testifying about workpapers prepared by Beazer's independent auditors at Deloitte & Touche, who contemporaneously examined various Beazer reserves and judged them to be reasonable. JA2010, 4559-4591. The court first

excluded expert testimony about the workpapers as "not relevant" and "confusing." JA2010 ("It's not relevant what Deloitte & Touch opined at the time."). The court's ruling appeared to leave open the possibility of admitting some portion of the workpapers as business records. JA2014-2016. However, the court later reasoned that, because Deloitte witness Corbin Adams had "walked away" from certain conclusions about the GMAC sale-leaseback transaction (JA2475), all of the workpapers were "not reliable" (JA2480). *Cf.* Fed. R. Evid. 803(6)(E) (business record exception does not apply to documents that "indicate a lack of trustworthiness").

The Court's rulings were erroneous. To start, the workpapers were plainly relevant: They contained the findings of an independent and contemporaneous evaluation of Beazer's reserves, which the prosecution alleged were improperly manipulated. The jury would have reason to doubt that allegation if it learned that Deloitte had reviewed Beazer's accounting records, drawn directly from JD Edwards (JA4562); had examined Beazer's reserves on a consolidated basis (JA4565); and had concluded that Beazer's reserves were justified and reasonable (JA4571, 4575, 4582). Indeed, elsewhere the court acknowledged "the accuracy of

the books tends to show reasonable doubt as to the conspiracy to commit fraud." JA2009.[8] That same principle should have controlled here.

Beyond that, the records would have shown that Beazer's reserves were *lower* than expected in 2001 and 2002, times the prosecution alleged that Beazer was fraudulently *inflating* its reserves. JA4565, 4571. The jury also would have learned that Deloitte investigated a $10.6 million decrease to Beazer's land reserves in the third quarter of 2006 (an important part of the prosecution's case) and concluded the decrease was "properly recorded." JA4590. The workpapers therefore surpassed the "low barrier" of relevancy and were "worth consideration by the jury." *Leftenant*, 341 F.3d at 346.[9]

The court's later theory that Adams' testimony undermined the reliability of the workpapers was also unfounded. Adams did not testify about Deloitte's auditing of reserve accounts—the purpose for which Rand sought to admit the papers. His testimony was about the *separate* GMAC transaction. With respect to reserves, Beazer employees testified that Deloitte had full access to necessary

---

[8]    The court recognized this probative value when it allowed the defense—in an isolated instance—to cross-examine Beazer's controller with a Deloitte work paper. JA1919-1921.

[9]    Nor would testimony concerning the workpapers have been "confusing." JA2010. The workpapers described what the auditors examined and their conclusions. JA4582, 4590. The court identified no reason that testimony about them would cause "the trial [to] be unduly prolonged" or the jury to "lose sight of the main issue." 2 *Wigmore on Evidence* § 443, at 529 (Chadbourn rev. 1983).

accounting data.  JA1389-1390, 1636-1637, 1800-1802.  The court's reliability

ruling thus conflated distinct issues and rested on a "clearly erroneous assessment

of the evidence," an abuse of the court's discretion.  *Highmark Inc. v. Allcare

Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1748 n.2 (2014).

> ### C.    The Court Improperly Permitted The Prosecution To Use Lay
> ### Opinion Testimony As A Substitute For Expert Testimony

The trial court's evidentiary rulings created an asymmetrical playing field in

a third respect.  The court permitted the prosecution, which designated but did not

call any accounting expert, to elicit *lay* opinions from Beazer witnesses about

whether complex accounting transactions were proper or improper.  The court thus

permitted precisely what the Federal Rules of Evidence are structured to prevent—

namely, "evad[ing]" the "reliability requirements set forth in Rule 702" regarding

expert testimony "through the simple expedient of proffering an expert in lay

witness clothing."  Fed. R. Evid. 701 advisory committee note.[10]

Lay witnesses may not offer opinions about matters of "technical" or "other

specialized knowledge" requiring expert proof.  Fed. R. Evid. 701(c), 702.  "Expert

evidence is necessary … when lay people are unable to make a reasoned judgment

alone."  *Buckner v. Polk*, 453 F.3d 195, 221 (4th Cir. 2006).  That principle

frequently will apply to accounting transactions, whose principles are "not [a] lucid

---

[10]    Rand's motion in limine (Dkt.26) preserved this issue for appellate review.
*United States v. Wilson*, 118 F.3d 228, 238 (4th Cir. 1997).

or encyclopedic set of pre-existing rules," but are "often indeterminate" and require "continuous judgments and estimates." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100-101 (1995).

The complexity of the accounting at issue here cannot reasonably be debated. The evidence made clear that setting reserve levels was a complex process involving historical analysis of costs and projections of future cost (JA1277, 1434-1435), and that the GMAC transaction was governed by a "complicated [accounting] rule" (JA2092). In such circumstances, accounting principles must be explained by experts, not lay witnesses. *See United States v. Morales*, 108 F.3d 1031, 1039 (9th Cir. 1997) (en banc) ("bookeeping principles" are "clearly beyond" a layperson's knowledge); *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 564 n.17 (11th Cir. 1998) ("[A]ccounting expertise is among the sorts of technical and specialized expertise the use of which is governed by Rule 702.").

Despite that, the prosecution was permitted to evade the requirements and safeguards governing expert testimony by simply substituting lay opinions from witnesses with no demonstrated expertise. For example, the prosecution introduced lay testimony from Beazer witnesses that: "[a]n accountant should use … the lower end of [a] range" of estimated costs (i.e., any reserve greater than this low end is inappropriate) (JA1434); accountants may not "go back and fix a prior

- 49 -

period" (i.e., you cannot change reserves based on new estimates) (JA1293);[11] land reserve releases must be tied to the releases of specific bonds (i.e., you cannot change land reserves based on other information about future costs) (JA1750); and certain practices would not qualify for sale-leaseback accounting treatment (i.e., Beazer incorrectly reported earnings from its GMAC transaction) (JA2149, 2153). Prosecution lay witnesses also opined that Rand's accounting was "improper" because he instructed them to adjust reserves to hit earnings targets. JA1290, 1672. But those witnesses were not experts and did not know *how* Rand calculated earnings targets. JA1393-1394, 1722. Even Beazer's Controller agreed that an adjustment to hit earnings targets could be appropriate if there was a legitimate basis for the adjustment. JA1899.

In sum, based on cumulative and misleading lay opinion testimony, and without offering *any* expert witness testimony, the prosecution argued to the jury that it could reach a number of accounting-related conclusions, including that the GMAC transaction did not qualify for "sale leaseback treatment" (JA2950), and that Rand had committed "accounting fraud" (JA2955). The court's decision to permit lay opinion testimony to substitute wholesale for expert analysis in this manner "evaded" the "reliability requirements set forth in Rule 702." Fed. R. Evid. 701 advisory committee note.

---

[11]     *Contra* JA2496 (post-quarter adjustments are "routine and customary").

### D.    These Errors Prejudicially Affected All Counts

The cumulative effect of these errors was substantial.  Rand was denied access to JD Edwards to secure evidence necessary for his defense; the evidence he could locate, the Deloitte workpapers, was excluded; and the prosecution was given free rein to reduce a complex accounting case to lay opinion testimony.  The errors were mutually reinforcing and, cumulatively, they left the jury with a one-sided, distorted picture of the accounting case.  *See, e.g.*, *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) ("overall effect of all the errors" should be considered, rather than "balkanized, issue-by-issue harmless error review").

These errors accordingly require reversal of at least the accounting convictions (counts 1 and 2).  But the errors also infected the jury's resolution of the obstruction charges (counts 6, 9, and 11), which all required proof of scienter. A jury that found Rand guilty of an accounting conspiracy would naturally conclude Rand had a motive to obstruct.  Indeed, the prosecution argued just that, claiming that Rand deleted emails because he "was involved in his own criminal accounting scheme" (JA824), and he "knew that once they started looking at his emails he was in deep, deep doo doo" (JA3020).  The court's erroneous accounting rulings thus prejudiced *all* counts.  *See, e.g.*, *United States v. Hornsby*, 666 F.3d 296, 311 (4th Cir. 2012); *Lindstadt v. Keane*, 239 F.3d 191, 205 (2d Cir. 2001); *United States v. Wright*, 665 F.3d 560, 575 (3d Cir. 2012).

### III.   THE PROSECUTION COMMITTED REVERSIBLE MISCONDUCT IN ITS CLOSING ARGUMENT

Rand is also entitled to a new trial in light of repeated and reinforcing prejudicial remarks made by the prosecution in closing summation.  The prosecution appealed to class prejudice, commented on Rand's silence at trial, and vouched for the credibility of the key witness.  Its improper summation so infected "'the trial with unfairness as to make the resulting conviction a denial of due process.'"  *United States v. Wilson*, 135 F.3d 291, 297 (4th Cir. 1998); *see also Lighty*, 616 F.3d at 361 (factors to consider for prejudice).

Rand preserved this claim of error by objecting to the prosecution's vouching during rebuttal (JA3011), and moving for a mistrial immediately afterwards on the basis of the other misconduct (JA3028).[12]  Review is *de novo*. *United States v. Collins*, 415 F.3d 304, 307 (4th Cir. 2005).

### A.   The Prosecution Improperly Appealed To Class Prejudice

"[A]ppeals to class prejudice are highly improper and cannot be condoned" in criminal prosecutions.  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 239 (1940); *see, e.g.*, *United States v. Bradley*, 644 F.3d 1213, 1271 (11th Cir.

---

[12]     *See, e.g.*, *United States v. Azubike*, 504 F.3d 30, 39 n.9 (1st Cir. 2007) (claim of error preserved by mistrial motion "made immediately after" rebuttal argument); *United States v. Green*, 305 F.3d 422, 430 (6th Cir. 2002) (similar; counsel need not "object continuously during the closing").  *But cf. United States v. Brainard*, 690 F.2d 1117, 1122 (4th Cir. 1982) (denial of mistrial motion after summation reviewed for plain error based on the circumstances of that case).  Neither the prosecution nor the court suggested Rand's motion was untimely.

2011) ("Use of a defendant's wealth to appeal to class bias can be 'highly improper' and can deprive that defendant of a fair trial."); *United States v. Stahl*, 616 F.2d 30, 32-33 (2d Cir. 1980) (similar). Nor may the prosecution "denigrate[] the right of a criminal defendant to retain the counsel of his choice." *Sizemore v. Fletcher*, 921 F.2d 667, 671 (6th Cir. 1990). The prosecution thus commits reversible misconduct when it impugns "'the defendant and his high-paid lawyer'" and asks the jury not to allow the defendant "'to buy his way out of'" trouble. *United States v. Farinella*, 558 F.3d 695, 700 (7th Cir. 2009).

The prosecution's rebuttal argument flouted these principles. The prosecution's first words to the jury in rebuttal were: "You just heard a story all right. It took a lot of gold. A lot of gold. The defendant's lawyers, all of them, his experts, a lot of gold." JA3010. The prosecution did not stop there. It twice referred to Rand as "rich" in discussing testimony from Rand's wife. JA3012. And the prosecution ended its summation on the same theme: "[Y]ou can go live in the story like the [emperor] with no clothes and listen to the story that was bought with gold, or you can look at the facts." JA3023. These improper remarks were not "'isolated,'" but rather "'extensive'" and repeated. *Lighty*, 616 F.3d at 361. In a few minutes of rebuttal, the prosecution discussed Rand's supposed wealth *eight* times.

Contrary to the prosecution's claim (JA3030), these remarks were not responsive to the defense summation. Defense counsel had used the parable of the emperor's new clothes to encourage the jury to be skeptical of the prosecution's case; in doing so, counsel referred in passing to "a bag of gold" used to pay for the clothes. JA3008-3009. That was hardly license for the prosecution to use the word in a completely different manner and to disparage, repeatedly, the "gold" Rand used to retain counsel, hire experts, and mount a full defense.

The prosecution instead sought to reinforce a trial theme it had failed to present evidence to support. The only motive the prosecution identified for the alleged crimes was greed. It promised the jury this was "a case about ambition, greed, and cheating on Wall Street" (JA820), but it struggled to identify any evidence to back that promise. It could not, for example, offer any evidence that Rand himself financially benefited from the alleged conduct. JA2280. The prosecution's appeals to class prejudice thus had the purpose and effect of diverting the jury's attention from the prosecution's failure of proof by painting the defendant as a wealthy man attempting to buy his way out of trouble. That is reversible misconduct. *Farinella*, 558 F.3d at 700.

## B. The Prosecution Improperly Commented On Rand's Silence

The prosecution's rebuttal separately violated Rand's Fifth Amendment privilege by inviting the jury to draw an adverse inference from his silence.

Argument that is "manifestly intended" or "'naturally and necessarily take[n] … to be a comment on the failure of the accused to testify'" is forbidden. *United States v. Francis*, 82 F.3d 77, 78 (4th Cir. 1996). Here, the prosecution highlighted to the jury Rand's decision not to testify about events leading up to his alleged confession. Early in the rebuttal, the prosecutor described "the defense" in this way: "[t]he FBI is lying. And I [Rand] lied to the FBI because I [Rand] was desperate." JA3010. The prosecutor returned to this point, explaining:

> But then he also said, but wait, I also lied to the FBI *because I was desperate*. How those fit together I didn't understand, maybe you did. So I heard that the FBI lied, I also heard that Mr. Rand lied because he was desperate. *Why was he desperate? He didn't say.*

JA3012 (emphasis added).[13]

## C. The Prosecution Wrongly Vouched For A Key Witness

Finally, the prosecution committed misconduct by vouching for Curran's credibility. The prosecution comes before the jury cloaked with the authority of the United States, and it is reversible error for the prosecution to misuse that position "to bolster or to vouch for its own witnesses." *United States v. Lewis*, 10 F.3d 1086, 1089 (4th Cir. 1993). The prosecution did that here, arguing that

---

[13] The prosecution below claimed to be referencing what defense counsel "didn't say." JA3012. That is not how the jury would have understood things. The rebuttal argument repeatedly referred to *Rand's* theory about why *Rand* was desperate. *E.g.*, JA3010 ("I lied to the FBI because I was desperate."), 3012 ("I also lied to the FBI because I was desperate.")]. The jury would have understood "Why was he desperate? He didn't say" to comment on *Rand's* silence.

Curran's account of Rand's supposed confession must be believed because, if Curran lied, "he's risking perjury.  He's risking the loss of his career.  There's a federal judge sitting right there going to put him in jail[.]"  JA3011.

These comments were decidedly improper, as courts have held.  *See United States v. Gracia*, 522 F.3d 597, 600-601 (5th Cir. 2008) (witness "who has worked as a law enforcement agent for many years … would throw all that away by taking this stand and taking an oath and lying to you"); *United States v. Combs*, 379 F.3d 564, 575 (9th Cir. 2004) (agent "risked losing his job by lying on the stand"); *see also United States v. Boyd*, 54 F.3d 868, 871-872 (D.C. Cir. 1995) (collecting cases).

The court sustained Rand's objection to vouching (JA3011), but it did not direct the jury to disregard it or give a curative instruction.  Simply sustaining the objection, on the facts here, was insufficient because the harm could not be undone.  *Cf. United States v. Forlorma*, 94 F.3d 91, 95 (2d Cir. 1996) ("we cannot be confident that the judge's unexplained ruling dispelled the misperception that was likely caused").  Vouching "'is especially problematic … where the credibility of the witness is crucial,'" *Combs*, 379 F.3d at 576, and that was undoubtedly so here.  Curran was extensively cross-examined about discrepancies between his trial testimony, his contemporaneous notes of Rand's proffer sessions, and his later write-up of those notes.  *See supra* n.22 & n.4.  Had the jury doubted Curran's

testimony, it may well have doubted the supposed confession.  Vouching for such a key witness, even with a sustained objection, warrants reversal.

*    *    *

The prosecution had only eighteen minutes for rebuttal.  JA3010.  From start to finish, it put that important moment—the jury's last chance to hear the arguments of counsel after a long, complicated, and close trial—to ill use.  The prejudice to Rand can be cured only by a new trial.

## IV.    THE COURT MISCALCULATED RAND'S GUIDELINES SENTENCE

At a minimum, the Court should vacate Rand's sentence and remand for resentencing because the court miscalculated the amount of loss caused by Rand's conduct in determining the advisory Sentencing Guidelines range.  When a district court miscalculates the guidelines range, "'the resulting sentence is procedurally unreasonable and subject to being vacated.'"  *United States v. Dodd*, 770 F.3d 306, 309 (4th Cir. 2014).  The relevant facts are undisputed, "so review is *de novo*." *United States v. Ruhe*, 191 F.3d 376, 390 (4th Cir. 1999).

The court calculated an offense level of 51 for a guidelines range of life imprisonment, capped by the statutory maximum.  JA3284-3285; *supra* pp.24-25. That was driven almost entirely by U.S.S.G. § 2B1.1, which sets the offense level for certain fraud offenses and requires an increase based on the "loss" caused by offense conduct, according to a table in § 2B1.1(b)(1).  *See* SJA27.  An application

- 57 -

note instructs that, "in a case involving the fraudulent inflation or deflation in the value of a publicly traded security," such as this, loss should be calculated based on how the price of a security changed "after the fraud was disclosed to the market." U.S.S.G. § 2B1.1 Application Note 3(F)(ix).

At sentencing, the parties debated which of three Beazer public disclosures qualified as the date on which the "the fraud was disclosed to the market":

- **June 27, 2007:** Beazer announced that Rand had been fired for "destroy[ing] documents" and that an investigation was ongoing involving mortgage origination and "related matters." JA4624.

- **August 10, 2007:** Beazer announced that its investigation "has discovered that [Rand] may have caused reserves ... to have been recorded … in excess of amounts that would have been appropriate," but that the "investigation is ongoing" and that Beazer did not "believe that the amounts … are quantitatively material." JA4626.

- **October 11, 2007:** Beazer summarized the findings of its investigation, quantified the effects of Rand's reserve adjustments, explained the GMAC issue, and informed the public that Beazer would restate its financials. JA4606-4607.

The court held that the fraud was disclosed in June and August and that the loss to investors following those dates was $135 million. JA3279-3280. Both parties agreed, however, that applying the same methodology to the October disclosure resulted in a loss of $0. JA3128-3129, 3255.

The court's holding that the June and August announcements disclosed the fraud to the market was legal error. The June announcement disclosed that Rand had been fired for deleting emails, but did not mention any reserve adjustments,

GMAC, or any improper accounting.  JA3243, 4624.  Nothing about the disclosure could have led a reasonable investor to believe that Beazer's financial statements had been misstated.

The August announcement simply disclosed an accounting investigation, not any findings of material accounting misconduct.  Beazer disclosed that its mortgage investigation had revealed accounting issues that "may have" occurred and the company explained that some reserves "could have been used" to increase earnings inappropriately.  JA4626.  But Beazer made clear that it was "not … able to predict or determine whether any adjustments will be required" to its financial statements, and that it did "not believe that the amounts at issue" were "quantitatively material." *Id.*

In analogous circumstances, courts have held that the date an investigation of possible wrongdoing is announced is not the proper benchmark for measuring shareholder loss.  For example, the Ninth Circuit has held that analogous disclosures are "insufficient to establish loss causation" for purposes of the securities laws, *Loos v. Immersion Corp.*, 762 F.3d 880, 883 (9th Cir. 2014), which require showing "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Typically, that causal link is established by showing the impact on share prices following a corrective disclosure of fraud to the market. *E.g.*, *Katyle v. Penn Nat'l Gaming,*

*Inc.*, 637 F.3d 462, 471-473 (4th Cir. 2011). Inconclusive announcements of an investigation, however, do not suffice to disclose fraud and cause loss:

> While the disclosure of an investigation is certainly an ominous event, it simply puts investors on notice of a potential future disclosure of fraudulent conduct. Consequently, any decline in a corporation's share price following the announcement of an investigation can only be attributed to market speculation about whether fraud has occurred. This type of speculation cannot form the basis of a viable loss causation theory.

*Loos*, 762 F.3d at 890. The announcement of an investigation is "just that—an investigation—and nothing more." *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013); *see, e.g.*, *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 909-910 (W.D. Tex. 2008). Market reaction to such an announcement reflects at best "[s]peculation and conjecture." *Katyle*, 637 F.3d at 477.

These well-established precepts of "loss causation in a civil fraud case" should apply "at least as strongly[] to a sentencing regime in which the amount of loss caused by a fraud is a critical determinant of the length of a defendant's sentence." *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007); *see United States v. Olis*, 429 F.3d 540, 546-547 (5th Cir. 2005). As applied here, those legal principles dictate that the October disclosure is the proper benchmark to measure investor loss. That is time when Beazer announced the *findings* of its investigation—namely, that reserves had been "improperly released into income during fiscal 2006." JA4606.

Importantly, however, there was no statistically significant drop in Beazer's stock price after the October disclosure. JA3128-3129, 3255. Because disclosure of Rand's conduct did not cause investor loss, his correct offense level was 19, with a guidelines range of 30-37 months. Dkt.377, at 12. Although the court did vary downward from the guidelines range it used to impose a ten-year sentence, it was required to calculate the guidelines range correctly in the first instance. The remedy is to vacate the sentence and to remand for resentencing. *United States v. Clay*, 627 F.3d 959, 961 (4th Cir. 2010).

## CONCLUSION

The Court should vacate Rand's convictions and order a new trial on all counts. Alternatively, the Court should vacate and remand for resentencing.

July 24, 2015

Respectfully submitted.

/s/ Seth P. Waxman

STEPHEN D. COUNCILL
ROGERS & HARDIN LLP
229 Peachtree Street NE
2700 International Tower
Atlanta, GA 30303
(404) 522-4700

SETH P. WAXMAN
BRENT J. GURNEY
JEANNIE S. RHEE
KELLY P. DUNBAR
MATTHEW GUARNIERI
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

CLAIRE J. RAUSCHER
WOMBLE CARLYLE SANDRIDGE
  AND RICE LLP
One Wells Fargo Center
301 South College Street, Suite 3500
Charlotte, NC 28202
(704) 331-4961

## REQUEST FOR ORAL ARGUMENT

Rand respectfully requests that the Court hear oral argument in this appeal, which raises a number of complex factual and legal questions that oral argument would assist the Court in resolving. Among other complicating factors, there were two jury trials below, resulting in a record that spans approximately five thousand transcript pages and hundreds of exhibits; the prosecution's theory of its obstruction case shifted substantially between those two trials as a result of the botched forensic analysis of Rand's emails; and the underlying charges involve, as alleged, a nearly eight-year conspiracy, numerous Beazer personnel, and hundreds of separate accounting judgments and adjustments. The legal issues Rand presents in the appeal are commensurate in complexity and merit argument. For example, whether the standard of *United States v. Nixon*, 418 U.S. 683 (1974), applies to subpoenas seeking documents from third parties has been the subject of considerable disagreement among lower courts. And this Court has not previously addressed how to calculate loss to investors under the Sentencing Guidelines applicable here—a matter of significant consequence in any case involving alleged fraud at a public company.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i).

1.     Exclusive of the exempted portions of the brief, as provided in Federal Rule of Appellate Procedure 32(a)(7)(B), the brief contains 13,941 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Federal Rule of Appellate Procedure 32(a)(7)(B), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Seth P. Waxman
SETH P. WAXMAN

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2015, I filed the foregoing Brief

electronically with the Clerk of the Court and served on all parties of record

through the CM/ECF system.


/s/ Seth P. Waxman
SETH P. WAXMAN